# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

NICOLAS CIMIENTOS,

        Plaintiff,

    v.

SCOTT FRAUENHEIM,

        Defendant.

Case No.  14-cv-00016-BLF

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

[Re:  ECF 15]

Nicolas Cimientos, a state prisoner represented by counsel, filed an amended petition for writ of habeas corpus pursuant to 28 U.S.C. §2254 challenging his state criminal conviction of seven counts under California Penal Code §§ 264.1 (forcible rape in concert) and §286(d) (sodomy in concert with force).  ECF 15.  Petitioner asserts three exhausted claims of ineffective assistance of counsel.  Respondent filed an answer and response addressing the merits of Petitioner's claim, and exhibits in support thereof.  ECF 22, 22-1, 23, 24.  Petitioner filed a traverse in response.  ECF 27, 28.  Having reviewed the briefs and the underlying record, the Court concludes that Petitioner is not entitled to relief and DENIES the amended petition.

## I.    BACKGROUND

In 2010, Petitioner was tried and convicted in Monterey County Superior Court.  A jury found Petitioner guilty of seven counts of forcible rape in concert and one count of forcible sodomy in concert.  Ex. 1 to Answer 288–89, ECF 23-1 (Clerk's Transcript or "CT").  On April 1, 2011, the trial court sentenced him to 200 years to life in state prison.  *Id.* at 378–79.

Petitioner appealed and, on October 18, 2012, the California Court of Appeal issued a written opinion affirming the judgment and denying relief based on alleged ineffective assistance of counsel.  Ex. 6 to Answer, ECF 24-3 (Ct. App. Decision).  On January 23, 2013, the California Supreme Court denied Petitioner's petition for review.  Ex. 8 to Answer, ECF 24-3.

Petitioner initiated this case on January 2, 2014.  ECF 1.  On January 1, 2015, Petitioner

United States District Court
Northern District of California

filed an amended petition.  ECF 15.  In his amended petition, Petitioner raises one additional claim

for relief, which has been exhausted for the purpose of federal habeas review.  *Id.*

## II.    SUMMARY OF EVIDENCE AT TRIAL

    In its written opinion, the California Court of Appeal fairly and accurately summarized the

factual background of Petitioner's case at trial as follows:

I.    *Prosecution Evidence*

    On the evening of June 3, 2006, Jane Doe 1 and Jane Doe 2 went together to
the Fiesta Days celebration at Vosti Park in Soledad, arriving around 8:00 to 9:00
p.m.  The event had live music, dancing, and a carnival.  The two women drank
some beer sold at a concession stand.  About 45 minutes after they arrived, they
met Armando Gonzalez, whom they had not met before, and another man he
identified as his brother, Salvador.  Armando asked the women to dance and they
declined.  Jane Doe 2 asked Armando to take a picture of the two women, and he
took three photos with a disposable camera they had brought to the park.
Armando asked the women for their telephone numbers; they declined because
they weren't interested.  At some point after having run into Armando and
Salvador several times, Jane Doe 2 told Salvador that they didn't want to dance
and asked him to leave them alone.

    Between 10:30 and 11:00, Jane Doe 1 and Jane Doe 2 decided to leave
Vosti Park because the beer concession stand was closed.  They started walking to
a nearby convenience store to buy some beer.  As they were leaving the park,
Armando approached them, asked where they were going, and said he wanted to
get to know them better.  They responded that they were just going to the store
and asked him to leave them alone.  Armando followed the women to the store,
which was about two blocks away.  There was a truck parked at the front of the
store, and the women saw three men other than Armando near it.  According to
Jane Doe 1, "[t]hey were kind of hiding . . . over . . . on the side [of] the truck."
The three men were Armando's brother, Salvador, whom they had seen at the
park; Felipe Perea, who was later a passenger in the front seat of the truck; and
defendant, who was the driver.  Jane Doe 1 and Jane Doe 2 testified that as they
approached the truck, Salvador, armed with a knife, came up from behind,
threatened Jane Doe 1, and told her to get into the truck.  He also told her not to
scream.  Jane Doe 1 did not see the knife, but felt it pressed against her back.
Jane Doe 2 got into the back seat of the truck first, entering from the passenger's
side.  Armando got in the back seat next, followed by Jane Doe 1.  Salvador rode
in the front with defendant and Felipe.  Jane Doe 1 testified that she was scared
for her life because the men had gotten the women into the truck "at knife point."

    They stopped at a liquor store approximately one block from the
convenience store.  Armando, Salvador, and Felipe stayed in the truck with the
women; the driver went inside and returned with a 12-pack of Corona beer.  There
were no handles on the rear door of the truck, so Jane Doe 1 and Jane Doe 2 could

not exit it. Defendant entered Highway 101 heading north. While they were on the highway, the men gave Jane Doe 1 and Jane Doe 2 beer, and they drank it. Salvador also passed around a marijuana cigarette and he and Armando asked Jane Doe 1 and Jane Doe 2 to smoke it with them, and they did. Jane Doe 1 testified that she wanted to try to be friendly to the men "[s]o that, hopefully, eventually, they will just let us go home. Let us off somewhere." The women asked where they were being taken. One of the men suggested going dancing at a club; Jane Doe 1 liked the idea because then she and her friend would be able to get away from the men. They drove from Soledad to Salinas. As they passed Chualar and approached Salinas, Jane Doe 1 asked Salvador, "'What club are we going to?'" He said they were going to Los Arcos in Salinas. After passing all of the Salinas exits, the women "started freaking out," asking repeatedly where they were going. Salvador and Felipe told them to be quiet. The truck exited the freeway north of Salinas and got onto Espinosa Road in Castroville. They drove ahead, turned off the paved road, and came to a field and stopped next to a shed where it was "pitch black." Jane Doe 1 was "[s]cared, frightened, [and] screaming," asking where they were, why they were there, and telling the men to take her back. One of the men told her to calm down, indicating that he needed to stop to use the restroom. Jane Doe 2 was also scared and yelled at the men and asked where she and her friend were being taken.

The men directed the women to exit the truck. Salvador opened the rear door on the driver's side, and Jane Doe 2 got out first, followed by Armando, and then Jane Doe 1. Jane Doe 2 was taken by Armando and defendant several feet away from the truck. As Jane Doe 1 got out, she saw Salvador had the knife in his hand; he was gesturing with it, and told her to get out. He placed the knife against her neck, took her to the side of the truck, and told her to be quiet. Jane Doe 1 yelled to Jane Doe 2, "'Look. He has a knife, and he's going to stab me with it.'" Jane Doe 2 saw Salvador restraining her friend and holding a knife to her neck; Jane Doe 2 asked Armando to tell Salvador "to calm down." Armando and defendant were restraining Jane Doe 2, who was struggling to free herself, and they told her to calm down.

Felipe pulled Jane Doe 1 to the ground. Salvador pulled down her pants and underwear and raped her while Felipe held her down. Jane Doe 1 screamed and cried, and Salvador struck her in the ribs while he was raping her. Afterward, Felipe raped Jane Doe 1 while Salvador was near her with his knife and held her down. At some point Salvador left for a while. He returned after a while and sodomized Jane Doe 1. While she was being raped and sodomized, she heard Jane Doe 2 screaming, asking her assailant(s) to get off of her and to leave her alone.

While Jane Doe 1 was being assaulted, Armando pulled Jane Doe 2 to the ground. As she struggled to get up, defendant grabbed her legs. Defendant then pulled off her pants and underwear, ripping her underwear. Defendant then raped her while Armando restrained her arms. Afterwards, Armando raped Jane Doe 2 while defendant restrained her.

Salvador and Felipe then came over to where Jane Doe 2 was being

assaulted.  First Salvador raped her, and then Felipe raped her.

When Salvador and Felipe went over to Jane Doe 2, Armando approached Jane Doe 1, threw her in the back seat of the truck, and raped her.  At some point, defendant approached Armando from behind and said, "'Just leave her alone.'"

Jane Doe 1 got out of the truck to look for her friend.  She found Jane Doe 2 further out in the fields.  The four men got into the truck and drove away.  Jane Doe 1 and Jane Doe 2 went away—at first running, and later walking—in the opposite direction of where the truck had gone.  Both were barefoot.  Jane Doe 1 was without pants or underwear; Jane Doe 2 gave her a green shirt she had been wearing over a tank top, and Jane Doe 1 wore it as a makeshift skirt.  They walked through muddy and rocky fields of uneven elevation; Jane Doe 1 testified that they traveled "for a long time" over an approximate distance of three miles.  They ultimately saw lights and a house, and knocked on the door.  The women asked the people in the house to call the police.

Jane Doe 1 and Jane Doe 2 were taken by Monterey County Deputy Sheriff David Worden to Natividad Medical Center in Salinas for sexual assault examinations.  Jane Doe 1 had bruises on her torso caused by Salvador having struck her in the ribs.  Based upon forensic evidence obtained from the victims (i.e., vaginal, cervical, and rectal swabs), it was determined that there was a match to Felipe's DNA typing from the three swabs obtained from Jane Doe 1, and there was a match to Armando's DNA typing from the three swabs obtained from Jane Doe 2.

After taking the women to the hospital, Deputy Worden surveyed the artichoke fields in Castroville and located the scene of the incident.  Peace officers searching the scene located a cardboard container with Corona beer bottles, a disposable camera, jeans, women's shoes, a sheath to a knife, torn women's underwear, and a purse.

Officer Michael Rivera, a certified Spanish speaking officer with the Salinas Police Department, along with Sergeant Thomas Marchese of the Soledad Police Department, conducted an interview of defendant on June 23, 2006.  After advising defendant of his *Miranda* rights (*Miranda v. Arizona* (1966) 384 U.S. 436), and after defendant indicated his willingness to be questioned, Officer Rivera interviewed him in Spanish.  Defendant initially denied having attended Fiesta Days in June 2006.  He later admitted that he and his friends, Armando, Salvador, and Felipe, had traveled in his truck from Salinas to the event.  At the end of the evening, defendant said that two women had gotten into his truck with his friends, they had stopped at a liquor store for beer, and had driven toward Salinas.  At Salvador's direction, they had driven to Castroville.  Defendant told the officers that he had pulled off to use the bathroom, and that when he returned to the truck, he saw Salvador threatening the women with a knife.  During the interview, defendant said that he had held one of the women down while Armando raped her, and then defendant had raped her.  (Later in the interview, defendant indicated that he had not actually raped the woman because he could not get an erection.)  He told the officers that although he could not see the other

United States District Court
Northern District of California

woman while this was occurring, he could hear her screaming.  Defendant also said that he had overheard Salvador threatening to kill one of the women if she did not be quiet.  He indicated that after a while, Salvador came over and had sex with the woman defendant had previously restrained and then raped.  Defendant also stated that the woman who had originally been with Salvador and Felipe was later raped inside the truck.

## II.  *Defense Evidence*

Defendant testified on his own behalf.  On the evening of June 3, 2006, defendant, driving his truck, picked up his friends, Armando and Felipe, at their homes in Salinas.  (Salvador invited himself along.)  Defendant had known Armando, Salvador, and Felipe since they were in grade school in Mexico.  They went to Fiesta Days in Soledad.  They split up after arriving at Vosti Park.  After receiving a call from his wife, defendant returned to his truck, which was parked in front of a store.  He called his friends separately so that they could all go home.  Armando and Salvador arrived first with two women.  They got into the truck and Salvador and Armando introduced them to defendant.  Defendant did not get out of the truck, and the women were not forced at knifepoint into the truck.  Felipe eventually arrived, defendant asked where the women lived, and one of them asked to be taken to the outskirts of Soledad.  They drove to a store to buy beer at Jane Doe 2's request.

All of the passengers were drinking and smoking marijuana in the truck.  They were going to go to La Movida in Salinas, but Salvador told defendant to go toward Castroville to another club, Franco's, and "one of the girls said that's fine, go that way."  While they were driving on Espinosa Road, one of the women said they needed to turn back; defendant made a left turn, and got off on a side road because he needed to use the restroom.  At Salvador's direction, defendant pulled up near an equipment shed.

Defendant and Felipe got out of the truck and walked a distance from the truck.  When they returned, Salvador was behind the truck on the ground with Jane Doe 1, and Armando was behind the truck off to the right with Jane Doe 2.  Defendant saw Armando and Jane Doe 2 kissing and overheard Armando asking her if she wanted to have sex; she replied, "[Y]es."  Defendant testified that after Jane Doe 2 asked Armando to use a condom and he said he didn't have one, she "got all excited" and said, "no more, and then she began to yell."  Salvador then approached Jane Doe 2, produced a knife, and said "'Shut up or I'm going to kill you.'"  Jane Doe 2 "calmed down" and Salvador, brandishing the knife and pointing it at defendant, directed defendant to help him.  Armando also asked defendant to help him.  Defendant grabbed Jane Doe 2's hands.  He did so because he was afraid Salvador, Armando, and Felipe would harm him if he didn't help Salvador.  He testified, "There's three [*sic*] of them.  And then they were all drugged up[,] too."  Armando pulled off Jane Doe 2's pants and underwear and had sex with her.  At that point, defendant let go of her and backed away because he thought what he was doing was "not right."  At that time, defendant saw Salvador on top of Jane Doe 1 and Felipe was off to the side of her.  Salvador told her not to scream.  Defendant also saw Felipe having sex with Jane

Doe 1.

Later, Salvador "came back" to Jane Doe 2 and took her further away, and Armando grabbed Jane Doe 1 and put her in the rear compartment of the truck. After some time passed, defendant told the other men to leave the women alone. Armando got out of the truck and defendant told Jane Doe 1 to find her friend.

Defendant got back in the truck; Salvador got in and told him they should leave. Defendant asked where the women were, and Salvador responded that they had "[taken] off running" because they "were very scared." Defendant backed out and Armando and Felipe jumped into the truck bed. While they were driving back to Salinas, Salvador still had the knife and he said "if someone talks about this it's going to go really bad for them or for their family. [*Sic.*]" Defendant didn't go to the police because of this threat.

After being arrested, defendant told the police he had raped one of the women. He did so because Officer Rivera and Sergeant Marchese threatened him and told him if he didn't plead guilty he would never see his parents again, but that if he pleaded guilty to one of the charges, he would be released and would be able to go to work the next day.

Ct. App. Decision 2–9 (footnotes omitted).

### III.   LEGAL STANDARD

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *Rose v. Hodges*, 423 U.S. 19, 21 (1975). The writ may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). The only definitive source of clearly established federal law under 28 U.S.C. § 2254(d) is in the holdings (as opposed

United States District Court
Northern District of California

to the dicta) of the Supreme Court as of the time of the state court decision.  *Williams*, 529 U.S. at 412; *Brewer v. Hall*, 378 F.3d 952, 955 (9th Cir. 2004).  While circuit law may be "persuasive authority" for purposes of determining whether a state court decision is an unreasonable application of Supreme Court precedent, only the Supreme Court's holdings are binding on the state courts and only those holdings need be "reasonably" applied.  *Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir.), *overruled on other grounds by Lockyer v. Andrade*, 538 U.S. 63 (2003).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  "Under § 2254(d)(1)'s 'unreasonable application' clause, . . . a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly."  *Id.* at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  *Id.* at 409.

Here, as noted, the California Supreme Court summarily denied Petitioner's petitions for review.  Ex. 8 to Answer.  The California Court of Appeal, in its opinion on direct review, addressed Petitioner's claims of ineffective assistance of counsel, and thus was the highest court to have reviewed the claim in a reasoned decision.  Accordingly, it is the court of appeal's decision that this Court reviews herein.  *See Ylst v. Nunnemaker*, 501 U.S. 797, 803–04 (1991); *Barker v. Fleming*, 423 F.3d 1085, 1091–92 (9th Cir. 2005).

The Supreme Court has vigorously and repeatedly affirmed that under AEDPA, there is a heightened level of deference a federal habeas court must give to state court decisions.  *See Hardy v. Cross*, 132 S. Ct. 490, 491 (2011) (per curiam); *Harrington v. Richter*, 562 U.S. 86, 96–101 (2011); *Felkner v. Jackson*, 562 U.S. 594 (2011) (per curiam).  As the Court explained: "[o]n federal habeas review, AEDPA 'imposes a highly deferential standard for evaluating state-court rulings' and 'demands that state-court decisions be given the benefit of the doubt.'"  *Id.* at 598 (citation omitted).  With these principles in mind regarding the standard and limited scope of

1  review in which this Court may engage in federal habeas proceedings, the Court addresses

2  Petitioner's claims.

3  **IV.    DISCUSSION**

4      Petitioner asserts that trial counsel rendered ineffective assistance of counsel by: (1)

5  stipulating that petitioner's co-defendants entered no contest pleas; (2) failing to object to the

6  testimony of a sexual assault physician's assistant that the victim's physical injuries were

7  consistent with their accounts; and (3) failing to object to testimony of the acting assistant

8  laboratory director of a crime laboratory on the grounds that it violated his rights to confrontation,

9  due process, and a fair trial.  Pet. at 2–4.

10      **A.    Legal Standard**

11      A claim of ineffective assistance of counsel is cognizable as a claim of denial of the Sixth

12  Amendment right to counsel, which guarantees not only assistance, but also effective assistance of

13  counsel.  *Strickland v. Washington*, 466 U.S. 668, 686 (1984).  In order to prevail on a claim of

14  ineffective assistance of counsel, petitioner must prove two elements.  First, he must establish that

15  counsel's performance was deficient, *i.e.*, that it fell below an "objective standard of

16  reasonableness" under prevailing professional norms.  *Id.* at 687–88.  Second, he must establish

17  that he was prejudiced by counsel's deficient performance, *i.e.*, that "there is a reasonable

18  probability that, but for counsel's unprofessional errors, the result of the proceeding would have

19  been different."  *Id.* at 694.  A court need not determine whether counsel's performance was

20  deficient before examining the prejudice suffered by the defendant as the result of the alleged

21  deficiencies.  *See Strickland*, 466 U.S. at 697; *Williams v. Calderon*, 52 F.3d 1465, 1470 & n.3

22  (9th Cir. 1995) (applauding district court's refusal to consider whether counsel's conduct was

23  deficient after determining that petitioner could not establish prejudice).

24      The *Strickland* framework for analyzing ineffective assistance of counsel claims is

25  considered to be "clearly established Federal law, as determined by the Supreme Court of the

26  United States" for the purposes of 28 U.S.C. § 2254(d) analysis.  *See Cullen v. Pinholster*, 563

27  U.S. 170, 188–89 (2011).  A "doubly" deferential judicial review is appropriate in analyzing

28  ineffective assistance of counsel claims under § 2254.  *See id.* at 201–02.  The general rule of

United States District Court
Northern District of California

8

*Strickland*, *i.e.*, to review a defense counsel's effectiveness with great deference, gives the state courts greater leeway in reasonably applying that rule, which in turn "translates to a narrower range of decisions that are objectively unreasonable under AEDPA." *Cheney v. Washington*, 614 F.3d 987, 995 (9th Cir. 2010) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). When § 2254(d) applies, "the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 131 S. Ct. at 788.

### B.    Stipulating that Petitioner's Co-Defendants Entered No Contest Pleas

Petitioner claims that trial counsel provided ineffective assistance by stipulating that Petitioner's co-defendants had pled guilty without either further requesting an admonition that such evidence could not be considered as evidence that Petitioner was guilty or utilizing such stipulation on Petitioner's behalf at trial. Mem. Points & Authorities ISO Pet. ("Mem.") 8, ECF 15-1. Petitioner contends that the admission of the stipulation constituted evidence that the crimes charged had in fact occurred and served no reasonable tactical purpose because it did not serve to bolster Petitioner's defense that he participated under duress and that material factual discrepancies existed. *Id.* 9. Moreover, Petitioner argues that the stipulation undermined his position that the alleged victims were unreliable. *Id.* at 10.

On appeal, the state appellate court rejected Petitioner's claim that defense counsel rendered ineffective assistance by entering the stipulation:

> Defense counsel Barnett noted in her declaration submitted at the beginning of trial that the then-recent development of the no contest pleas by Armando and Salvador was "a significant factor to Mr. Cimientos['s] defense" and that "[i]t is material to his defense that the jury be able to know that they have plead[ed no contest] in this case." On appeal, defendant acknowledges [the statements of his counsel requesting judicial notice of Petitioner's codefendants' pleas], but argues that Barnett never made clear at trial the significance of the no contest pleas. He asserts that "[t]he admission of the stipulation regarding the co[]defendants' pleas served no reasonable tactical purpose." He contends that this evidence was harmful to the defense, and, indeed, that "it cast a pall over Appellant's defense from the very beginning of the evidentiary phase of trial . . ." He therefore argues that Barnett's action in permitting the jury to consider it was prejudicially ineffective assistance. We disagree.
>
> It is apparent on the face of Barnett's declaration that she believed that it

United States District Court
Northern District of California

would be strategically to her client's benefit for the jury to know about the no contest pleas of Armando and Salvador. The record does not disclose further the reasoning behind this conclusion. And there is no indication Barnett was "asked for an explanation and failed to provide one." Thus, unless "there simply could be no satisfactory explanation" for Barnett's concluding that it was to defendant's benefit to present evidence of the convictions of two of his codefendants, the ineffective assistance claim must fail.

It is true that, in general, "evidence regarding the guilty plea or conviction of a coparticipant in a crime is not admissible to prove guilt of a defendant. [Citations.]" As our high court has noted, the probative value of a coparticipant's guilty plea relative to a crime for which the defendant is on trial is "questionable at best" particularly when it "invites an inference of guilt by association." But the fact that the no contest pleas of Armando and Salvador here may have been inadmissible does not suggest that defense counsel's agreement that the jury could hear such evidence necessarily constituted ineffective assistance.

We disagree with defendant's assertion that "[n]o reasonable attorney would have agreed to, let alone have been the proponent of, such a clearly harmful stipulation which destroyed Appellant's defense before it ever got started." The underlying premise of defendant's argument—that the stipulation was "clearly harmful"—is flawed. Defendant urges that the evidence "served to actively undermine Appellant's position that the [victims'] statements were unreliable because it told the jury that the others involved had, by inference, accepted the credibility of the [victims] without contesting their innocence by going to trial, and admitted their guilt." This is mere speculation. While it is true that the stipulation told the jury that Armando and Salvador had admitted their guilt, this evidence was entirely consistent with the victims' testimony. Both Jane Doe 1 and Jane Doe 2 clearly and without contradiction identified Armando and Salvador as two of the men participating in their kidnapping and sexual assault. Further, this evidence was consistent with defendant's own testimony, namely, that Armando and Salvador (who wielded a knife) sexually assaulted both victims. Thus, since defendant acknowledged that he was present when the assaults occurred, evidence of the no contest pleas of his two friends did nothing more than corroborate the testimony of both the victims and of defendant himself.

Further, we disagree with defendant's assertion that there could have been no tactical reason for Barnett's stipulation. Defense counsel may have reasonably believed that permitting the jury to hear about the no contest pleas of Armando and Salvador was supportive of defendant's theory of the case that the two were the ones who actually committed the crimes, and that defendant had only briefly held down Jane Doe 2 for Armando and had failed to prevent the crimes out of fear for his safety.

Similar circumstances were presented in *Neely*.[1] There, after his arrest, the defendant admitted that he had been present with two confederates, M.W. and

---

[1] *People v. Neely*, 176 Cal. 4th 787 (Ct. App. 2009).

10

Meeks, at a store where a robbery and murder transpired; he claimed that the three had only intended to commit a robbery, that defendant was unarmed and merely the lookout, that M.W. and Meeks were armed, and that M.W. had shot the victim.  Defense counsel did not object to testimony of a deputy sheriff that M.W. had confessed to participating in the crime, and defendant asserted an ineffective assistance claim on this basis on appeal.  The court rejected the claim, concluding that "[b]ecause the evidence of Neely's guilt was strong, trial counsel reasonably focused on minimizing Neely's role in the crimes and shifting the blame onto M.W. and Meeks.  Counsel reasonably could conclude that evidence of M.W.'s confession might have been beneficial to Neely's defense because it identified another person who could be blamed for the actual shooting."

Moreover, even were we to conclude that there could have been no reasonable tactical reason for Barnett's agreement to have the jury learn about the no contest pleas—a conclusion we do *not* reach here—the ineffective assistance claim necessarily fails because defendant cannot demonstrate prejudice.  By defendant's own testimony, Armando and Salvador *did commit* rape upon the two victims.  Thus, evidence that they admitted their guilt simply confirmed defendant's version of the events.  Further, since defendant admitted he was present at the scene—but denied that he was a willing or active participant in the crimes—the no contest pleas did not present the jury with an improper inference that because two of his confederates admitted their guilt, defendant was likewise guilty by his association with them.  Stated otherwise, because identification (i.e., defendant's presence at the crime scene) was not an issue at all, the no contest pleas of Armando and Salvador were not crucial to the prosecution's case.  We therefore conclude that defendant has not shown "a reasonable probability that, but for counsel's [assumed] unprofessional errors, the result would have been more favorable to defendant, i.e., a probability sufficient to undermine confidence in the outcome."

Ct. App. Decision 14–17 (citations omitted) (footnote added).

The California Court of Appeal's rejection of Petitioner's claim was not an objectively unreasonable application of *Strickland*.[2]  *See Williams*, 529 U.S. at 409, 411.  The Court must first consider whether the California Court of Appeal reasonably concluded that defense counsel's performance was not deficient.  *Demirdjian v. Gipson*, 832 F.3d 1060, 1065–66.  To evaluate the reasonableness of counsel's actions, the Court must consider the circumstances at the time of counsel's conduct and cannot "second-guess" counsel's decisions or view them with the benefit of

---

[2] The Court rejects Petitioner's contention that trial counsel should be afforded no deference in her performance because she violated her duty to develop a clear trial strategy.  *See* Mem. 10.  The cases Petitioner cites to support this assertion confirm that *Strickland* requires judicial scrutiny of counsel's performance to be highly deferential, but that nevertheless, a court may find counsel's performance ineffective where, for example, he or she does not conduct a reasonable investigation.  *See, e.g.*, *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir. 1994).  This does not mean that counsel is not afforded deference.

United States District Court
Northern District of California

1   hindsight. *Edwards v. Lamarque*, 475 F.3d 1121, 1127 (9th Cir. 2007).

2          Although Petitioner has not provided a declaration from trial counsel to show her actual

3   reasons for stipulating to the admission of the no contest pleas, the record supports the state

4   appellate court's reasoning that she may have made a strategic determination that the jury's

5   knowledge that Armando and Salvador had entered no contest pleas benefited Petitioner because it

6   supported his rendition of the facts and his defense. *See* Ex. 1, at 219–20, ECF 23-1.  As the

7   California Court of Appeal recognized, the no contest pleas were equally consistent with the

8   victims' testimonies as well as Petitioner's trial testimony and prior admissions.  When discussing

9   the incident with the police, Petitioner admitted that he saw Salvador threaten the women with a

10  knife, and that he, Armando, Salvador, and Felipe raped them.  Ex. 2 (Vols. 13–14), at 3918–22,

11  ECF 24.  He further admitted that pressure from the other men made him feel "obligated" to

12  commit the assault.  *Id.* at 3923.  At trial, Petitioner testified that he saw Salvador, Armando, and

13  Felipe rape the women, and that he participated only after Salvador threatened him with a knife.

14  Ex. 2 (Vols. 1–2), at 180–94, ECF 23-3.  Evidence that Salvador and Armando had entered pleas

15  served to support the defense theory that Petitioner acted only under duress.

16          Petitioner contends that entering the stipulation without either requesting an admonition

17  that such evidence could not be considered as evidence that Petitioner was guilty or utilizing such

18  stipulation on Petitioner's behalf at trial was unreasonable because it constituted evidence that the

19  crimes occurred.  Mem. 8–9.  Moreover, Petitioner argues that admission of the stipulation

20  actively undermined his position that the women's statements were unreliable "because it told the

21  jury that the others involved had, by inference, accepted the credibility of the Does without

22  contesting their innocence by going to trial, and admitted their guilt."  *Id.* at 10.  However, as

23  discussed above, the California Court of Appeal reasonably determined that evidence of the no

24  contest pleas "did nothing more than corroborate the testimony of both the victims and of

25  [Petitioner] himself."  Ct. App. Decision 15.  Indeed, Petitioner himself gave credence to at least a

26  portion of the women's testimony and statements by testifying that he saw Salvador, Armando,

27  and Felipe rape the women.

28          In his traverse, Petitioner argues that the state appellate court's decision is not reasonable

United States District Court
Northern District of California

because its reasoning ignores the trial record. Mem. ISO Traverse 5, ECF 27. Specifically, Petitioner points to the fact that while defense counsel challenged the credibility of the complaining witness's testimony during her closing argument, she did not mention the no contest pleas. *Id.* Petitioner thus concludes that the "'tactical reason' invented by the court of appeal was unsupported by the very testimony and argument upon which that court relied." *Id.* However, Petitioner provides no support for the premise that where counsel fails to mention evidence during closing argument, there can be no strategic reason to have introduced the evidence during trial. To the contrary, it would be impractical, if not impossible, for counsel to address each piece of evidence introduced at trial during closing arguments, lest closing arguments would last as long as the trial itself. Moreover, that after hearing all of the prosecution's evidence, defense counsel chose not to address the no contest pleas says nothing of the tactical decision to stipulate to the entry of such evidence before the trial began. Finally, as previously discussed, trial counsel represented to the trial court that the no contest pleas were essential to Petitioner's case. Ct. App. Decision 14. Accordingly, the Court finds Petitioner's argument on this issue meritless.

Petitioner also argues that defense counsel's alleged ineffective assistance was prejudicial because without this evidence, the testimony of the women would have been entirely uncorroborated. Mem. 13. This is meritless in light of Petitioner's own testimony. Petitioner also contends, for the first time in his traverse, that he testified that a crime had been committed only to mitigate the admission of his statement to police, which he contends was coerced and untrue. Mem. ISO Traverse 7. To the extent Petitioner is attempting to raise a new claim of a coerced confession, a traverse is not the proper pleading to raise additional grounds for relief. *See Cacoperdo v. Demosthenes*, 37 F.3d 504, 507 (9th Cir. 1994) (additional claims must be presented in an amended petition so that respondent has an opportunity to respond). For this reason alone, this argument must be denied.

Lastly, in light of the record before the Court, the Court concludes that the California Court of Appeal's determination that Petitioner failed to demonstrate prejudice was not objectively unreasonable. Petitioner told the police and testified that Armando and Salvador raped the women. Ex. 2 (Vols. 13–14), at 3918–22; Ex. 2 (Vols. 1–2), at 180–94. Thus, evidence of their

no contest pleas merely confirmed Petitioner's version of the events.  Accordingly, this Court cannot say that there is a "substantial, not just conceivable" likelihood that the jury would have reached a different decision had defense counsel requested an admonition that the no contest pleas could not be considered as evidence of guilt or had counsel utilized such evidence during closing arguments, much less that the California Court of Appeal "unreasonably" applied *Strickland* in rejection Petitioner's ineffective assistance of counsel claim on this ground.  *See Harrington*, 562 U.S. at 111–12.  Thus, Petitioner is not entitled to federal habeas relief on this ground.

**C.     Failure to Object to the Testimony of the Physician's Assistant**

Petitioner's second ground for relief is that trial counsel rendered ineffective assistance of counsel by failing to object to evidence by the Sexual Assault Response Team ("SART") nurse that the injuries to the complaining witnesses corroborated their version of the events.  Mem. 11.  Petitioner contends that no foundation established that the SART nurse was an expert qualified to distinguish between genital injuries caused by sexual assault as opposed to some other cause.  *Id.*

The California Court of Appeal summarized the testimony of the sexual assault physician's assistant as follows:

> After Jane Doe 1 and Jane Doe 2 were taken by Deputy Warden to Navidad Medical Center, each woman was examined separately by Dawn Hartzog, a physician's assistant and a certified forensic examiner for the Sexual Assault Response Team (SART).  With each patient, Hartzog (1) took a history by asking about any possible bodily injuries, including questions directed toward "reveal[ing] any sexual assault type findings"; (2) conducted an examination, which included a full vaginal, pelvic, and rectal examination, and obtaining a sexual assault kit (including obtaining vaginal, cervical, anal, oral, and [in the case of Jane Doe 1] rectal swabs); and (3) documented any injuries by using a standard form promulgated by the state Office of Emergency Services used for all sexual assault examinations.

> Hartzog observed from her physical examination of Jane Doe 1 that she had bruises and mud on her feet; red blotches on her scapula; scratches on her face and above the tailbone; a bruise on her right knee; bruises on her ribcage; and black mud in or about her anus.  She testified that these injuries and this condition were "consistent with" the history described by Jane Doe 1.  Based upon her examination of Jane Doe 1, Hartzog did not find evidence of any injuries to the genitalia of Jane Doe 1; however, she testified that "[i]t is common to find no injury [to the genitalia]" in sexual assault cases.

14

From her physical examination of Jane Doe 2, Hartzog observed that she had scratches on the left side of her back in the coccyx area, on her left elbow, and on both thighs; injuries to her little and ring fingers; mud on her feet; and a possible abrasion to her labia majora.  Hartzog testified that the latter injury was one that is frequently seen in instances of sexual assault and was "consistent with Jane Doe 2's history."  Hartzog also testified that other injuries she observed were "consistent with" the history Jane Doe 2 had described.

Ct. App. Decision 17–18.

The Court of Appeal determined that defense counsel's failure to object to Hartzog's qualifications and opinions was not incompetent or prejudicial, reasoning as follows:

2. *Expert's Qualifications*

Hartzog is a licensed family practice physician's assistant.  In that capacity, she is authorized "to take histories, do physical exams, treat and assess . . . people of all ages . . . ."  Prior to working as a SART examiner, Hartzog worked (1) at Natividad Medical Center, where 50 percent of her time concerned women's health and obstetrics; (2) for the health department for five to six years also doing work in women's health and obstetrics; and (3) at the student health center at California State University at Monterey Bay, where she was "a solo practitioner" in which about 50 percent of her work related to women's health.  She became a forensic SART examiner in 2005 and received specialized training in the area (for the examination of both adult and child victims) at University of California at Davis.  Hartzog went through a "credentialing" process required for SART examinations performed at Natividad, where the examinations of the two victims in this case were performed.  Before having performed the examinations of Jane Doe 1 and Jane Doe 2, Hartzog had conducted approximately 20 SART examinations.  Overall, between 2005 and 2009, she had performed approximately 150 SART examinations and had testified as an expert witness in that field in Monterey County courts on five occasions.

Defense counsel did not object at the time the prosecution offered Hartzog as an expert witness in the field of forensic SART examinations.  And the record does not reveal the reason for counsel's failure to object.  Given Hartzog's extensive background in the field of women's health and her more current training and experience in the field of SART examinations, defense counsel reasonably could have deemed an objection to Hartzog's qualifications an idle act.  In light of Hartzog's qualifications, it is likely that such an objection would have been overruled.  And since a trial court is vested with broad discretion in ruling on an expert's qualifications, and because this was certainly not an instance in which the "'''"witness *clearly lacks* qualification as an expert"'''", any such objection—had it been made and overruled—would not have preserved a meritorious claim of error in any event.  We therefore reject defendant's claim that counsel's failure to object to Hartzog's testimony based upon her alleged lack of qualifications as a SART examiner constituted ineffective assistance.

15

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California

### 3. *Expert's Opinions*

Defendant argues that it was improper for Hartzog to opine that the physical injuries sustained by Jane Doe 1 and Jane Doe 2 were consistent with the histories that the victims reported. He claims that "it constituted improper opinion as to Appellant's guilt or innocence." Elsewhere in his opening brief—and apparently alternatively to the claim that Hartzog improperly opined on defendant's guilt or innocence—he asserts that Hartzog's testimony was improper because it was "nothing more than an opinion that the [victims] were truthful and credible witnesses." Defendant's ineffective assistance claim is without merit.

Defense counsel did not object to testimony from Hartzog to the effect that the injuries she observed on the victims were consistent with the respective histories that each woman provided to her. And the record does not disclose the reason for this omission. It is entirely proper for a qualified expert to render an opinion concerning the cause of the injury based upon the physical appearance of the injury itself. Thus, it is permissible to have a qualified expert opine that a patient's injuries are consistent with a reported sexual assault. Therefore, since it is likely that any objection to Hartzog's testimony would have been overruled, deficient performance by defense counsel has not been shown here.

Further, we reject defendant's meritless contentions that Hartzog's testimony constituted improper opinions as to defendant's guilt or innocence, or, alternatively, as to the victims' veracity. It is certainly the case that expert testimony concerning the guilt or innocence of the defendant is improper. Moreover, opinion testimony concerning the veracity of another witness is generally inadmissible. But Hartzog's testimony ran afoul of neither principle. Her testimony that the physical injuries of Jane Doe 1 and Jane Doe 2 were consistent with their reported assaults was simply corroborative evidence that assaults on the two women occurred—a fact that was not in dispute. The expert's opinions did not directly implicate defendant in the commission of the crimes. Since by his own testimony, defendant conceded that his three companions had sexually assaulted the victims, Hartzog's testimony was equally as supportive of his theory of the case as it was of the prosecution's. It did not directly or indirectly present an opinion concerning defendant's guilt or innocence. Similarly, since the fact that Jane Doe 1 and Jane Doe 2 were sexually assaulted was not disputed by defendant, Hartzog's opinions that their injuries were consistent with their accounts of the assaults did not directly or inferentially corroborate their testimony that *defendant himself* assaulted them. Hartzog therefore did not offer an opinion concerning the veracity of either of the victims. Rather, she presented permissible testimony concerning whether the injuries presented were consistent with what the victims claimed had happened to them.

We therefore conclude that defense counsel's failure to object to Hartzog's qualifications or to her opinions did not constitute deficient performance that would support an ineffective assistance claim. Moreover, even were defense counsel's performance deficient—a conclusion we do not reach here—there was no prejudice. Because Hartzog's testimony did not directly implicate defendant

> as having been one of the assailants, and, indeed, her testimony equally supported
> defendant's theory that his companions (but not he) sexually assaulted the two
> women, there is not "a reasonable probability that, but for counsel's [assumed]
> unprofessional errors, the result would have been more favorable to defendant,
> i.e., a probability sufficient to undermine confidence in the outcome."

Ct. App. Decision 19–23 (citations omitted).

Petitioner does not directly address the state appellate court's findings. Rather, Petitioner appears to reargue the merits of his earlier position, claiming that "no foundation established that the SART nurse was an 'expert' in being able to distinguish between genital injuries that were caused by sexual assault as opposed to some other cause," and that by failing to object to such "pseudo-expert testimony," trial counsel provided ineffective assistance. Mem. 11. That contention alone, however, is not enough to support a finding of ineffective assistance of counsel. Even if Petitioner is correct that defense counsel's failure to object to the evidence presented by the SART nurse constituted ineffective assistance, Petitioner must also establish that there was a reasonable probability that but for counsel's deficient performance, the result of the proceeding would have been different and that the state appellate court's finding to the contrary was objectively unreasonable. *Strickland*, 466 U.S. at 694. As with the stipulation, Petitioner contends that without this testimony, the testimony of the women would have been uncorroborated. Mem. 13. For the reasons discussed above, this argument is meritless. *See supra*, at 13–14. Strengthening this conclusion is the fact that the nurse did not testify that Petitioner committed the crime or even implicate Petitioner. Rather, she testified that the women's injuries were consistent with rape. Mem. ISO Traverse 9; Mem. ISO Answer 16, ECF 22-1.

Having considered the evidence of record and controlling authority, the Court finds that the state appellate court's ruling that counsel did not render ineffective assistance was based on a reasonable application of Supreme Court precedent to the facts of record. Again, the question is not whether counsel's actions were reasonable, but rather, whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard. *Harrington*, 562 U.S. at 89. Here, Petitioner has failed to show that the state court of appeal applied the *Strickland* standard for ineffective assistance in an unreasonable manner. The state appellate court detailed Hartzog's qualifications to testify as an expert, and the Court finds that this determination was reasonable

1  given her experience.  The state appellate court was thus reasonable in concluding that trial

2  counsel was not ineffective in failing to object to testimony that was proper under California law

3  and did not violate Petitioner's right to due process.  *See, e.g.*, *Rupe v. Wood*, 93 F.3d 1435, 1445

4  (9th Cir. 1996) ("[T]he failure to take futile action can never be deficient performance.").

5       In his traverse, Petitioner raises two additional arguments.  First, Petitioner argues that

6  even if the state court's decision was reasonable, it violated his constitutional rights by not

7  considering federal standards of admissibility. Mem. ISO Traverse 9–10.  This claim is without

8  merit.  The case on which he relies, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579

9  (1993), is based on a federal rule of evidence, not the Constitution.  *Id.* at 594–95.  For that reason,

10 California courts are not required to apply it, and in fact do not.  *See People v. Leahy*, 8 Cal. 4th

11 587, 594 (1994).  Accordingly, the state appellate court's failure to apply *Daubert* does not

12 constitute an unreasonable application of clearly established Supreme Court precedent.

13      Second, Petitioner contends for the first time that it was not reasonable for the state court

14 to conclude there was no error with respect to an issue "not in dispute," *i.e.*, "that the assaults on

15 the two women occurred," because the only reason the issue was not in dispute was because

16 Petitioner testified to explain the effect of the stipulation and his role in the events and that he was

17 coerced into making certain admissions by the police.  *Id.* at 10.  This argument is unavailing

18 because Petitioner has not shown that the state appellate court unreasonably found that there was

19 no prejudice.  The California Court of Appeal found there was no prejudice because Hartzog's

20 testimony did not directly implicate Petitioner has having been one of the assailants, and it equally

21 supported Petitioner's theory that his companions sexually assaulted the two women.  Based on

22 the evidence presented, it was not unreasonable for the state appellate court to conclude that the

23 outcome at trial would not have been any different had counsel successfully objected to the

24 evidence.  *See Harrington*, 562 U.S. at 111–13 (finding the state appellate court's finding that the

25 defendant was not prejudiced by the alleged deficient performance of counsel where there was,

26 among other things, no evidence directly refuting the opinion of the expert).

27      **D.      Failure to Object to Testimony of the Acting Assistant Laboratory Director**

28           Petitioner's final argument is that trial counsel provided ineffective assistance by failing to

United States District Court
Northern District of California

object to the testimony of the acting assistant director of the California Department of Justice,

Freedom Criminalistics Laboratory, Greg Avilez, which was based on the findings of a non-

testifying, unavailable witness, and violated Petitioner's rights to confrontation, due process, and a

fair trial. Pet. 4, ECF 15; Mem. 11–13.

On appeal, the state appellate court rejected Petitioner's claim that defense counsel

rendered ineffective assistance by failing to object to the testimony of Mr. Avilez:

> We observe that, but for the United States Supreme Court's decisions in
> *Melendez-Diaz*[3] and *Bullcoming*[4], we would reject defendant's ineffective
> assistance claim on the basis that any objection to the constitutionality of
> admitting Avilez's testimony was meritless. Following *Geier*,[5] Kenny's report
> and any information therein were not testimonial, and therefore the introduction
> of the substance of the report through the testimony of Avilez did not deprive
> defendant of his confrontation rights.
>
> But the United States Supreme Court's decisions in *Melendez-Diaz* and
> *Bullcoming* make the application of *Geier* to this case less clear. The underlying
> facts in *Melendez-Diaz* are distinguishable from those before us, a point defendant
> concedes. Defendant nonetheless relies on *Melendez-Diaz* and contends that it
> "largely abrogated" *Geier*. In *Melendez-Diaz,* the high court was concerned with
> the constitutionality of admitting a laboratory worker's notarized certificates
> indicating the presence and quantity of cocaine, evidence directly used to convict
> the defendant. Here, the court admitted testimony of a supervisor concerning the
> substance of a report from a lab worker to the effect that she had detected the
> presence of sperm in the swabs in the sexual assault kits of the two victims. Only
> in a very indirect way—i.e., the sperm samples detected by the nontestifying lab
> worker were sent to another lab, where another analyst matched certain DNA
> profiles to the DNA profiles of Armando and Felipe, which, in turn, corroborated
> the victims' and defendant's own testimony that the two codefendants sexually
> assaulted the two women—was this evidence used to convict defendant.
>
> Defendant argues that the holding in *Bullcoming* mandates the conclusion
> that the admission of Avilez's testimony violated defendant's confrontation rights.
> But *Bullcoming*, like *Melendez-Diaz,* is distinguishable. There, unlike the
> circumstances here, the certificate of analyst, which showed that the defendant's
> blood sample contained a BAC of 0.21, was introduced without the analyst's
> testimony, and this evidence led directly to the defendant's conviction of
> aggravated drunk driving. And, unlike here, where the testifying witness was a
> supervisor in Kenny's laboratory and was familiar with the lab protocols used by
> her, in *Bullcoming,* the court repeatedly emphasized that the testifying witness

---

[3] *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009).
[4] *Bullcoming v. New Mexico*, 564 U.S. 647 (2011).
[5] *People v. Geier*, 41 Cal. 4th 555 (2007).

had no connection with the report generated by the nontestifying analyst.  Further, there is language in the concurring opinion of Justice Sotomayor "emphasiz[ing] the limited reach of the Court's opinion" and suggesting that the result might have been different had the case been one—as is the case here—where "the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue".

Defendant's contention also appears to have less forcefulness in light of the high court's decision in *Williams*.[6]  Were we to apply the objective test used in *Williams,* in which we would evaluate "the primary purpose that a reasonable person would have ascribed to the statement, taking into account all of the surrounding circumstances", it is dubious that the purpose of Kenny's report or the information contained therein was "to accuse [defendant] or to create evidence for use at trial".  Further, as was true in *Williams,* there is nothing to indicate that the nontestifying analyst, Kenny, could have possibly known that the sperm she identified from the swabs taken from the victims would ultimately inculpate defendant's coparticipants, Armando and Felipe.

To be sure, the *Melendez-Diaz* and *Bullcoming* decisions raise concerns both as to the constitutional claim here and as to the continued vitality of *Geier*.  A number of cases from other California appellate districts have addressed the latter question; some courts have concluded that *Melendez-Diaz* overruled *Geier,* while others have held that *Geier* is still good law.  Our Supreme Court has granted review of a number of such cases.  Very recently, the high court decided three of those cases, two of which bear brief mention here.

In *People v. Lopez*,[7] the defendant challenged on Confrontation Clause grounds the introduction of a nontestifying laboratory analyst's report indicating that the percentage of alcohol present in the defendant's blood sample drawn two hours after a fatal traffic accident; in admitting the evidence, the prosecution utilized the testimony of a colleague of the analyst who had prepared the report.  The high court distilled *Crawford*[8] and its progeny as requiring the presence of "two critical components" in order for a statement to be "'testimonial'" for purposes of the Confrontation Clause.  Those components are that (1) "the out-of-court statement must have been made with some degree of formality or solemnity" and (2) the statement's "primary purpose pertains in some fashion to a criminal prosecution".  Because it concluded that the lab analyst's report did not have the required formality or solemnity, the court concluded that it was not testimonial.

In *People v. Dungo*,[9] the high court addressed whether the defendant's confrontation rights were violated where a forensic pathologist testified concerning the cause of death of the victim (strangulation), where he utilized facts

---

[6] *Williams v. Illinois*, 132 S. Ct. 2221 (2012).
[7] *People v. Lopez*, 55 Cal. 4th 569 (2012).
[8] *Crawford v. Washington*, 541 U.S. 36 (2004).
[9] *People v. Dungo*, 55 Cal. 4th 608 (2012).

taken from an autopsy report prepared by a nontestifying pathologist and photographs of the victim.  The court rejected the defendant's claim, holding that neither of the two requisite components of a testimonial statement was present.  The court concluded that the statements contained in the autopsy report—which report was not introduced into evidence—were (1) "less formal than statements setting forth a pathologist's expert conclusions" and were akin to a physician's nontestimonial "observations of objective fact" in diagnosing a patient's injury or malady and indicating the appropriate treatment for it; and (2) "criminal investigation was not the *primary* purpose for the autopsy report's description of the condition of [the victim's] body".

Drawing upon our high court's recent *Lopez* and *Dungo* decisions, it would appear that any statements made by the nontestifying analyst, Kenny, here were nontestimonial because they were not "made with some degree of formality or solemnity.  [Citations]"  But we need not make a definitive determination here of whether Avilez's testimony violated defendant's confrontation rights.  Even were there to have been a Confrontation Clause violation (and thus deficient performance by trial counsel in failing to object), any such assumed error was harmless; therefore, any ineffective assistance was nonprejudicial in any event.

Our Supreme Court has held that error under *Crawford* is evaluated under the *Chapman*[10] standard, namely, "admission of the statements would require reversal unless we found beyond a reasonable doubt that the jury verdict would have been the same absent any error.  [Citations.]"  Under the *Chapman* standard, "an error is harmless only when, beyond a reasonable doubt, it did not contribute to the verdict."

Any assumed error here was harmless.  The testimony of Avilez to the effect that the lab analyst Kenny had found the presence of sperm in the swabs obtained from the two victims was of minimal importance in defendant's ultimate conviction of the eight charged sex crimes.  The Avilez testimony was linked to other forensic testimony that a certain DNA profile from the sperm sample obtained from Jane Doe 1 was a match to Felipe's DNA typing, and a DNA profile from the sperm sample obtained from Jane Doe 2 was a match to Armando's profile.  This scientific testimony did nothing more than establish what defendant admitted in his testimony: that Felipe and Armando sexually assaulted the victims.  Therefore, assuming that it was error to have admitted Avilez's testimony, based upon a constitutional challenge not asserted below, it was harmless beyond a reasonable doubt.  Therefore, since it is clear that defendant cannot establish the second element (prejudice), his ineffective assistance claim fails.

Ct. App. Decision 28–33 (citations and footnotes omitted) (alterations in original) (footnotes added).

After carefully reviewing the record, the Court concludes that the state appellate court's

---

[10] *Chapman v. California*, 386 U.S. 18, 24 (1967).

1  denial of this claim was not contrary to or an unreasonable application of clearly established

2  federal law for two reasons.  First, given the state of California and U.S. Supreme Court

3  Confrontation Clause jurisprudence at the time, there was not a reasonable probability that a

4  Confrontation Clause objection would have been sustained by the trial court or overturned on state

5  court appeal.  Second, even if the objection had been sustained by the trial court, there was not a

6  reasonable probability that the result of the trial would have been different.  As to the former, the

7  Supreme Court's decision in *Crawford v. Washington*, 541 U.S. 36 (2004), had, by 2012,

8  established that testimonial out of court statements were barred under the Confrontation Clause

9  unless the witness was unavailable and the defendant had a prior opportunity to cross-examine the

10  witness.  *Id*. at 59.  That decision, however, did not delineate precisely what statements qualify as

11  "testimonial," nor did it place testimony like Avilez's in that category.  *Id*. at 51-52.

12      First of all, the nature of Avila's testimony differed substantially from the testimony

13  examined in *Crawford*.  Although Avilez had not performed the crime lab's analysis, he was

14  qualified and testified as an expert, forming his opinions primarily based on reports he had

15  reviewed and which were not admitted into evidence.  It was not unreasonable for the state court

16  to determine that the testimony in question was admissible after *Crawford*.  *See Meras v. Sisto*,

17  676 F. 3d 1184, 1188 (9th Cir. 2012) (holding that *Crawford* did not clearly establish forensic lab

18  reports are testimonial).

19      Second, although the Supreme Court subsequently found in *Melendez-Diaz v.*

20  *Massachusetts*, 557 U.S. 305 (2009), that a forensic laboratory report ranked as testimonial for

21  purposes of the Confrontation Clause, it held only that a lab report could not be admitted without a

22  witness appearing to testify in person.  *Here,* Avilez appeared in person to testify at Petitioner's

23  trial, and thus his testimony did not violate the Confrontation Clause under *Melendez-Diaz*.  *Id.*

24      Indeed, even today, there does not appear to be clearly established federal law that would

25  make the admission of Avilez's testimony contrary to Supreme Court precedent under AEDPA.

26  Justice Sotomayor's concurring opinion in *Bullcoming v. New Mexico*, 564 U.S. 647 (2011)[11],

27

28  ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯
[11] The Court does not consider *Williams v. Illinois*, 132 S. Ct. 2221 (2012), which was decided
after Petitioner's trial.

United States District Court
Northern District of California

reinforces the conclusion that *Crawford* did not clearly establish a Confrontation Clause violation on these facts. Justice Sotomayor provided the decisive fifth vote for the majority in *Bullcoming*. In her separate opinion, she specifically identified Confrontation Clause questions that in her view remained unanswered by the Court's holdings in that 2011 case, let alone by *Crawford*. These unresolved areas included the treatment of experts testifying to their opinions based on reports not admitted into evidence, as well as the degree of proximity the testifying witness must have to the scientific test. *See id.* at 2722 ("We would face a different question if asked to determine the constitutionality of allowing an expert witness to discuss others' testimonial statements if the testimonial statements were not themselves admitted as evidence."); *id.* ("[T]his is not a case in which the person testifying is a supervisor, reviewer, or someone else with a personal, albeit limited, connection to the scientific test at issue. . . . We need not address what degree of involvement is sufficient . . . ."). Both of these open issues are relevant to Petitioner's case. If those areas remain unresolved as of today, the Court cannot conclude that the California court's conclusions in this case were contrary to clearly established federal law at the time.

Moreover, even if the objection had been sustained by the trial court, there was not a reasonable probability that the result of the trial would have been different. Petitioner's defense was based on the argument that Petitioner participated in the alleged crime under duress. The identification of Felipe and Armando as the persons who had sexual contact with the victims — the point made by the DNA identification evidence — was not disputed at trial, and in fact was supported by Petitioner's testimony. Nevertheless, Petitioner argues that Avilez's testimony "cinched the Government's case that a sexual assault occurred." Mem. ISO Traverse 15. This argument is unpersuasive. Again, Petitioner himself testified that a sexual assault did occur, but that he participated only under duress. Counsel's decision to focus the defense on duress was a strategic choice that Petitioner did not directly challenge and that we cannot second-guess here.

## V.   CONCLUSION

After a careful review of the record and pertinent law, the Court concludes that the Petition for a Writ of Habeas Corpus must be DENIED.

Further, a Certificate of Appealability is DENIED. *See* Rule 11(a) of the Rules Governing

Section 2254 Cases.  Petitioner has not made "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  Nor has Petitioner demonstrated that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Petitioner may not appeal the denial of a Certificate of Appealability in this Court but may seek a certificate from the Court of Appeals under Rule 22 of the Federal Rules of Appellate Procedure.  *See* Rule 11(a) of the Rules Governing Section 2254 Cases.

The Clerk shall terminate any pending motions, enter judgment in favor of Respondent, and close the file.

**IT IS SO ORDERED.**

Dated: January 23, 2017

BETH LABSON FREEMAN
United States District Judge